# EXHIBIT A

Christopher J. Gramiccioni, Esq. (019672008)
KINGSTON COVENTRY LLC
1 Gatehall Drive, Suite 305
Parsippany, New Jersey 07054
973.370.2227 (office)
973.566.5904 (facsimile)
chris@kingstoncoventry.com

Margo R. Zemel, Esq. (010971981)
Margo R. Zemel, Esq., P.C.
50 Park Place, Suite 1542
Newark, New Jersey 07102
973.242.1818 (office)
973.242.1817 (facsimile)
mrzesq@yahoo.com
*Attorneys for Plaintiff Sam A. Antar*

| | |
|---|---|
| SAM A. ANTAR, | NEW JERSEY SUPERIOR COURT |
| | LAW DIVISION - MIDDLESEX COUNTY |
| Plaintiff, | |
| | |
| vs. | DOCKET NO.: MID-L-_____-22 |
| | |
| THE BORGATA HOTEL CASINO AND | |
| SPA, LLC, B ONLINE CASINO, BetMGM,: | Civil Action |
| LLC, MGM RESORTS INTERNATIONAL : | |
| INC., ENTAIN PLC,  JOHN DOES 1-10, | |
| MARY DOES 1-10, and/or XYZ | |
| CORPORATIONS 1-10, | **COMPLAINT AND JURY DEMAND** |
| | |
| Defendants. | |

Plaintiff, Sam Antar ("Plaintiff"), by way of Verified Complaint against Defendants the

Borgata Hotel Casino and Spa; B Online Casino; BetMGM LLC; MGM Resorts International,

Inc.; Entain, PLC; John Does 1-10; Mary Does 1-10, and/or XYZ Corporations 1-10 ("the Doe

Defendants") (collectively, "the Defendants"), allege and state as follows:

## INTRODUCTION

1.      This is a multi-count civil action filed against the Defendants for civil conspiracy, conversion, fraud, negligence, breach of contract, unjust enrichment, and repeated violations of the New Jersey Consumer Fraud Act and the Racketeer Influenced and Corrupt Organizations (RICO) Act.

2.      At the heart of this matter is the Defendants' corrupt effort to fraudulently induce Plaintiff to conceal chronic online gaming disconnections and other related issues he routinely experienced from at least May 2019 through January 2020 (hereinafter, "the 9-month Period"); and to prevent him from reporting these systemic issues to the New Jersey Division of Gaming Enforcement (DGE or "the Division") and the general public.  During this period, Plaintiff gambled six (6) to eight (8) hours daily during all hours of the day, and placed more than 100,000 bets up to $5,000 per bet.  Plaintiff's total gambling activity for the 9- month period exceeded $29 million.

3.      Plaintiff, a compulsive and vulnerable gambler known to the Defendants, routinely experienced thousands of online internet gaming disconnections, oftentimes in the midst of favorable hands, every 15-30 minutes and was deprived of financially advantageous payments when Plaintiff "doubled down" on such hands.[1]

4.      Additionally, Defendants' online gaming platforms failed to properly maintain Plaintiff's proper bankroll balance on several occasions, with such "stuck" funds being released only after Plaintiff made additional deposits towards continued online gambling.  On several other hands, Plaintiff doubled down on hands and won, but the doubled-down funds were never provided or, in several instances, subtracted from his player account unbeknownst to Plaintiff.

---

[1] "Doubling down" refers to a gambling strategy whereby the player doubles the bet after viewing the initial, favorable hand of cards dealt in the game.

5.      In summary, the online gaming platforms operated by Defendants during this period malfunctioned and/or disconnected nearly 50% of the time Plaintiff was engaging in online gambling on the gaming platforms owned and/or operated, maintained and promoted by Defendants.

6.      During at least the 9-month Period, Plaintiff made dozens of attempts with Defendants to seek redress and resolution of these continuous gaming issues, specifically through multiple VIP account managers and corporate-level officials employed by Defendants; and via casino key employees, and complaint resolution sites publicly listed by Defendants. However, Defendants failed to remedy, much less address, the gaming malfunctions documented by Plaintiff but instead knowingly kept the malfunctioning games available to the general public because they were extremely profitable to Defendants' business operations.

7.      As a further part of the corrupt scheme to bribe Plaintiff, conceal the live online gaming malfunctions and avoid regulatory scrutiny by the DGE, and to keep him compulsively gambling, Defendants plied Plaintiff with near-daily bonus payments totaling more than $30,000 per month.

8.      This action seeks redress for the substantial damages suffered by Plaintiff for Defendants' corrupt and fraudulent business scheme and practices.

## THE PARTIES

9.      Plaintiff is an individual residing in the State and City of New York, diagnosed with gambling addiction disorder, whose compulsive gambling was widely and historically known to Defendants. Plaintiff was a longtime online and land-based customer of Defendants and was designated as a VIP "NOIR" MGM Rewards member. At all times relevant to this Complaint, Plaintiff engaged in prolific and ongoing gambling activity by using his BetMGM (Sama00) and

Borgata (Sama000) usernames within State of New Jersey borders, including, but not limited to, Middlesex, Essex, Bergen, Monmouth and Atlantic Counties.

10.     The Borgata Hotel Casino and Spa, LLC ("the Borgata") is the largest and top-grossing casino in the State of New Jersey, earning in excess of $730 million in annual revenue, and is operated by MGM Resorts International, Inc. The Borgata is a limited liability company with a principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

11.     B Online Casino ("B ONLINE") is one of the nation's oldest legal online gambling sites, and a product of MGM Resorts International, Inc. which operates several online betting brands under the BetMGM, LLC banner in the State of New Jersey. B Online is a limited liability company with a principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

12.     BetMGM, LLC ("BetMGM") is a market leading online gaming and sports betting company that maintains exclusive access to all of MGM's online gaming via market leading brands, including the Borgata. BetMGM earned $850 million in net revenues in 2021, and $271 million in first quarter of 2022 with a projected 2022 net revenue exceeding $1.3 billion. BetMGM is a limited liability company located at Harborside Plaza 3, 210 Hudson Street, Suite 602, Jersey City, New Jersey 07311.

13.     MGM Resorts International, Inc. ("MGM RESORTS") is an S&P 500 global hospitality and entertainment company that operates several online betting brands including B CASINO and, among other facilities, the Borgata. MGM RESORTS earned $11.88 billion in annual revenue for the twelve months ending in June 2022. MGM RESORTS is a corporation with its principal place of business at 3600 S. Las Vegas Avenue, Bellagio Hotel & Casino, Las Vegas, Nevada 89109.

14.     Entain PLC ("ENTAIN"), formerly GVC Holdings, PLC, is one of the largest online betting technology companies in the world.  In 2018, ENTAIN launched a joint venture with MGM RESORTS to create an online gaming and sports betting platform in the United States. BetMGM, borne out of this partnership, offers online gaming and sports betting using ENTAIN's U.S. licensed technology via market leading brands, including BetMGM and B CASINO. ENTAIN earned greater than $5.1 billion in annual revenue in 2021 and is a public limited company with its principal place of business at 32 Athol Street, Douglas, Isle of Man IM11JB.

15.     John Does 1-10 and Mary Does 1-10 are individuals whose identities are presently unknown to Plaintiff responsible for all or part of the acts and omissions complained of herein.

16.     XYZ Corporations 1-10 are entities whose identities are presently unknown to Plaintiff responsible for all or part of the acts and omissions complained of herein.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over defendants the Borgata and B Online because they are New Jersey organizations with principal places of business in Atlantic City, New Jersey.

18.     This Court has jurisdiction over BetMGM because it has a principal place of business in Jersey City, New Jersey, and is authorized and licensed to do business in the State of New Jersey (License Number: 0450301047).

19.     This Court has jurisdiction over Defendant MGM RESORTS because, among other things, it is licensed and authorized to do business in the State of New Jersey (License Number: 0100653543).

20.     This Court has jurisdiction over ENTAIN pursuant to R. 4:4-4, due to the extent of ENTAIN's joint business activities with MGM RESORTS and BetMGM in the State of New

Jersey, and because this cause of action arose from Defendants' activities and conduct within the State of New Jersey.

21.     Venue is proper in Middlesex County, New Jersey pursuant to R. 4:3-2. Venue is proper because Plaintiff engaged in substantial online gaming activities offered by Defendants in several sites across Middlesex County, including Edison, Perth Amboy, Woodbridge and New Brunswick. Additionally, Plaintiff sustained substantial losses in the aforementioned sites, including while parked at the Cheesequake (also referred to as "Jon Bon Jovi Service Area") and Thomas Edison Service Areas.

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

22.     At all times relevant to this Complaint:

a.      Plaintiff was a middle-aged family man who was a compulsive and vulnerable gambler struggling with gambling addiction disorder.

b.      Marcus Glover ("GLOVER") was the President and Chief Operating Officer (COO) of the Borgata.

c.      James Murren ("MURREN") was the chairman and CEO of MGM RESORTS.

d.      Quinton Hogan ("HOGAN") was a key employee and VIP Account Manager employed by the Borgata and BetMGM responsible for managing and retaining Borgata VIP online gaming and gambling customers.

e.      Jerry Liang ("LIANG") was a key employee and VIP Account Manager employed by the Borgata and BetMGM responsible for managing and retaining Borgata VIP online gaming and gambling customers.

   f.  Giovanni Jimenez Sabater ("SABATER") was a key employee and Senior VIP

Player Development Manager employed by the Borgata and BetMGM responsible for managing

and retaining Borgata VIP online gaming and gambling customers.

   g.  Pursuant to New Jersey state law and DGE regulation, a list of persons who must

be excluded from all gaming activities offered by licensed casinos was required to be maintained

by the DGE. Additionally, the DGE offered a Self-Exclusion Program allowing problem

gamblers to voluntarily exclude themselves from gambling in all Atlantic City casinos and from

participating in all internet gaming activities. To ensure compliance, DGE routinely updated and

distributed this exclusion list to all casinos operating in the State of New Jersey.

23.  At a date prior to 2018, due in part to his compulsive gambling addiction, Plaintiff opted

to participate in the Self-Exclusion Program, but thereafter removed himself from the exclusion

list at or near the end of 2018. Defendants were aware of Plaintiff's removal from the exclusion

list since they had a statutory and regulatory duty to prevent excluded individuals from engaging

in all gambling activities.

24.  Beginning in or about 2019, Plaintiff began gambling on land-based and online gaming

platforms offered by the Borgata and Defendants. Soon after, the Borgata invited Plaintiff to be

designated with "NOIR" VIP status, the highest available rewards status offered by Defendants.

The NOIR program provided Defendants precise records and data about Plaintiff and other

patrons' gambling patterns and behavior. According to the Borgata's rewards page, NOIR

customers are to be given "the best of everything, including "premium customer support" and a

"dedicated VIP host" for online gaming activities.[2]

---

[2]  https://www.borgataonline.com/en/p/borgata-rewards#borgata-rewards-benefits

25.     Plaintiff's gambling activity was prolific insofar as Plaintiff routinely gambled for days

on end with multiple-day binges lasting for up to 24 hours.  Plaintiff gambled during all days of

the week and all hours of the day; wagered substantial amounts of money; and played from

various devices in numerous locations across the State of New Jersey.

26.     At all times relevant to this Complaint, Plaintiff's online gambling activity included, but

was not limited to, playing online casino games such as live dealer blackjack and online slots

gaming.

27.     In 2019, Plaintiff's gambling activity exceeded $24 million; and more than $5 million in

a 16-day period in January 2020.[3]  During the 9-month Period, Plaintiff placed more than

100,000 online bets, with individual bets ranging up to $5,000, in addition to making more than

30 in-person visits to the Borgata casino.[4]

28.     The general terms and conditions published by Defendants expressly states the governing

law for disputes involving Borgata online gaming is within the exclusive jurisdiction of the

courts of the State of New Jersey.

29.     Upon information and belief, Defendants engaged in predatory gambling practices by

maintaining analytic tools, software and player tracking data, particularly for high-volume NOIR

gamblers, that was used to target and exploit Plaintiff to continually monetize and take advantage

of his robust gambling behavior.

### *Chronic and Continuous Online Gaming Malfunctions*

30.     From at least the 9-month Period, Plaintiff experienced thousands of online malfunctions

and disconnections while playing Defendants' online games which included, but are not limited

to, the Borgata's Live Dealer Blackjack and online slots games such as Lotusland,

---

[3] January 1 through January 16, 2020.
[4] In one 14-week period, Plaintiff placed nearly 42,000 bets.

8

Loot'enkhamun and Super Times.  Moreover, disconnections routinely occurred in the midst of favorable hands, which ultimately deprived Plaintiff of financially advantageous payments when he doubled down on such hands.

31.    Disconnections regularly occurred every fifteen (15) to thirty (30) minutes in play, resulting in a standard message from Defendants stating, "DISCONNECTED – you have been disconnected from the server.  Please refresh the game to continue.  If the problem persists, please contact the operator."  During the 9-month Period, Plaintiff received this disconnection message thousands of times, and captured hundreds of screenshots to corroborate the routine nature of the online gaming malfunctions.

32.    Disconnections further occurred oftentimes in the midst of favorable hands, which ultimately deprived Plaintiff of financially advantageous payments when he doubled down on such hands.

33.    Additionally, there were myriad issues where Defendants' failed to properly maintain Plaintiff's bankroll account or ensure gambling account integrity.  On many occasions, Plaintiff's bankroll failed to properly increase as hands were successfully played.  Such "stuck" funds were released only after Plaintiff made additional deposits to further his online gambling activity.  There were also several instances where Plaintiff doubled down on hands and won, but the doubled-down funds were removed from Plaintiff's player account without his knowledge.

34.    There were also dozens of instances where, upon logging back into a disconnected online game, the proper, financial favorable account balance had disappeared and inaccurately showed a $0 balance.  For example, on or about December 18, 2019, Plaintiff was playing an online live dealer blackjack with a balance of approximately $103,337.  During this hand, the game malfunctioned after 14 minutes, 5 seconds.  Upon immediately logging back in to continue

playing, the account balance inaccurately showed $0. At all times relevant to Complaint,
Plaintiff's bankroll account balance was overseen, operated and/or maintained by Defendants.

35.    During at least the 9-month Period, the online games offered, maintained, operated,
and/or promoted by Defendants malfunctioned or disconnected nearly 50% of the time Plaintiff
engaged in said online gaming. Exhibit A attached contains a non-exhaustive list of Game IDs
that malfunctioned in the manner set forth above and were captured with screenshots by
Plaintiff.

### *Multiple, Unsuccessful Attempts to Seek Redress with Defendants*

36.    On dozens of occasions during the 9-month Period, Plaintiff reported to Defendants the
thousands of malfunctions and financial losses experienced during his online gaming activity.
As more fully set forth below, Defendants' repeatedly stonewalled Plaintiff's complaints, never
remedying, much less addressing, the documented problems. Instead, Defendants ignored the
online gaming malfunctions all to ensure: (a) Plaintiff kept quiet and continued his high-
frequency gambling and (b) the Borgata and Defendants continued generating revenue from the
online games.

37.    As captured in several e-mails, text messages and consensually recorded conversations
retained by Plaintiff during the 9-month Period, multiple VIP Managers, corporate executives,
and other key employees affiliated with Defendants turned a blind eye to the chronic
malfunctions, losses and gaming technology issues he experienced.[5] Examples include, but are
not limited to:

---

[5] Any statements contained in e-mails, text messages and/or consensually recorded conversations set forth in this
Complaint are referenced in substance and in part.

### *VIP Account Manager Quinton Hogan*

a.      On or about May 20, 2019, during a consensually recorded conversation,

HOGAN, a key employee of Defendants, repeatedly acknowledged the existence of recurring

"connection issues" concerning live dealer blackjack, but advised Plaintiff that they could not

justify taking the malfunctioning game down because it was too much of a "moneymaker" for

the Borgata and Defendants.  HOGAN further admitted that the referenced malfunctions had

been occurring for a couple of months, and that HOGAN had been "escalating things left and

right" at the Borgata.  HOGAN offered no corrective action, but instead offered a number of

excuses, including instructing Plaintiff to remedy the problem himself by directing Plaintiff to

"*[g]o in, go out, go in, refresh"* the online games.

b.      Later in that same May 20, 2019 conversation, Plaintiff laid bare his gambling

addiction and frustrations to HOGAN while imploring HOGAN to get Defendants to fix the

malfunctioning games, informing HOGAN, *"[w]hen you're a gambler, you keep going at it you

can't help yourself."*  Plaintiff further exhorted HOGAN to have Defendants remove the

malfunctioning games and explained the problematic nature of the malfunctioning games for

high-frequency gamblers, imploring Defendants to "*shut it down - [a] gambler is a gambler,

they're gonna play it."*  Rather than recognizing Plaintiff's problem gambling behavior and

appropriately responding to his disclosure, HOGAN instead told Plaintiff to *"try and refresh*" to

correct the connection problems.  During this exchange, HOGAN plied Plaintiff with bonus

payments to ensure Plaintiff continued to use Defendants' online gaming platforms.[6]

---

[6] A bonus payment is a form of payment made by Defendants to incentivize patrons to continue gambling and play
more online games by providing free money and/or extra spin options during online gaming.
https://help.borgataonline.com/en/general-information/account/bonuses/what-is-a-bonus.

11

c.      On or about May 21, 2019, during another consensually recorded telephone conversation with HOGAN, Plaintiff continued to complain of recurring "stuck" games, and that he had tried to resolve the malfunctions through the Borgata online complaint resolution process, but the representative had no idea how to remediate the losses. HOGAN continued to advise that Defendants were *"looking into it"* but continued to give Plaintiff multiple bonus payments ranging from $1,000 to $5,000 to keep Plaintiff quiet and ensure his continued high-frequency gambling activity.

d.      On or about July 9, 2019, during a text communication exchange, Plaintiff again confronted HOGAN with the chronic and continuous online gaming malfunctions and disconnections causing him substantial losses. In response, HOGAN again attempted to induce Plaintiff not to report these malfunctions and continue gambling, stating *"Hey Sam, we have to come up with a good plan. Let's do a 5K deposit match per week?"* In this text exchange, HOGAN indicated that Defendants would match Plaintiff's deposits into his account weekly going forward. Plaintiff replied that he would make additional deposits, but as long as the online games were working correctly.

e.      On or about July 12, 2019, HOGAN sent a text to Plaintiff stating, *"Hey Sam I [sic] not able to get you the bonus today but I will focus on getting the games fixed. And once I have the ok we can set you up nice."* Less than one (1) week later, Plaintiff began receiving in excess of $30,000 in monthly bonus payments from Defendants.

f.      On or about July 17, 2019, in another text and e-mail communication, Plaintiff advised HOGAN that his attempts to withdraw funds from his online account maintained by Defendants took nearly ten (10) hours for Defendants to complete. Due to the severity of his gambling addiction, Plaintiff continued to deposit more online gambling funds while awaiting

12

payment for his withdrawals. Citing to the continuous and ongoing online gaming malfunctions and resulting financial losses and getting no resolution, Plaintiff advised HOGAN that *"the higher-ups need to know what is going on."* HOGAN acknowledged the ongoing gaming malfunctions, but instead kept issuing Plaintiff hush additional bonus payments, stating, *"I know it's frustrating but they are really working to resolve the issues you are experiencing. We have to fix the problem or you will continue to be frustrated. Other players are not getting anywhere near what you are getting. It will get better Sam, just fix the game and we should be fine."*

g.      On or about July 25, 2019, during a consensually recorded meeting, Plaintiff advised HOGAN that he had placed more than $3 million in bets over the past three (3) months, but he continued to experience cash-out issues in addition to chronic disconnections and "stuck" gaming problems. Plaintiff further advised that, only upon additional deposits being made would the problem occasionally resolve and, as a result, Plaintiff felt cheated. HOGAN replied, *"our boss he understands"* and further acknowledged that Plaintiff complaints were *"all valid points."*

h.      Later during that same July 25, 2019 meeting, Plaintiff demonstrated the ongoing malfunction problems by playing a game real-time with HOGAN which disconnected as further proof of the continuous, unresolved malfunctions by Defendants' online gaming platform. In response to Plaintiff's continued complaints, HOGAN stated, *"[w]e are gonna do everything we can to make this shit right for you no question."* Thereafter, Plaintiff cited to one example where he was up $47,000 while playing live dealer blackjack when a disconnection occurred and his balance was lost, to which HOGAN replied, *"we are gonna take care of this."*

i.      As was common practice after Plaintiff reporting online gaming issues, HOGAN claimed the malfunctions were being addressed by Defendants, but continued to feed Plaintiff

13

bonus payments ranging from $1,000 to $5,000. For example, on one date on or about July 31, 2019, Plaintiff complained to HOGAN that Plaintiff was disconnected over 140 times from 4 p.m. through 6 a.m. the evening prior while in the middle of free spins; while "up" in terms of winnings; and/or while having several free spins remaining. The ongoing problems, however, were never addressed or remedied. Defendants and Borgata officials simply fed Plaintiff more bonus money to buy his silence and keep him continually gambling.

        j.      On or about August 2, 2019, in another text communication, Plaintiff wrote HOGAN complaining about further gaming malfunctions, stating *"Ok, another day of getting screwed over by the Borgata, what else is new??? Enjoy your weekend."* HOGAN quickly replied, *"Don't worry I will take care of you."* Defendants did not address or remedy these gaming malfunctions.

        k.      On or about an August 14, 2019 text communication, Plaintiff sent HOGAN an extensive list of all Game IDs where online games malfunctioned, disconnected, or where funds were "stuck." HOGAN replied, *"Hey Sam we have the necessary info we are working to get this all cleared up. Please be patient with Jerry [LIANG] as he is working hard in my place."* Defendants did not address or remedy these gaming malfunctions.

        l.      In further text communication on or about August 14, 2019, Plaintiff again complained about continuous gaming malfunctions to HOGAN. HOGAN provided additional excuses, including unavailability of staff to escalate the issues and one staff member, LIANG, having "a lot on his plate already." In response to the complaints, HOGAN advised Plaintiff to write an e-mail to priority_support@borgatacasino.com. Later that same month in additional text communications, after Plaintiff inquired about the status of his complaints and requests for redress, HOGAN replied, *"Hey Sam no update worth mentioning.*

*Formalcomplaint@borgatacasino.com"* Defendants did not address or remedy these gaming malfunctions.

m.     On or about September 9, 2019, after months of stonewalling Plaintiff with promises of resolution, Plaintiff inquired again on the status of his unresolved gaming problems. HOGAN advised that Defendants own employees had no idea how to resolve the long-complained live dealer blackjack issues stating, *"[s]o we are awaiting [sic] for confirmation regarding error message error code 6 is confirmed the [double-down] rollbacks are another thing."*

n.     On or about September 26, 2019, Plaintiff sent multiple e-mails to Online Gaming Compliance Manager Rosalie Lopez seeking further explanation on the "error code 6" issues, but she also was unaware of what the error code messages meant and offered no solutions.

### *Online Complaint Reporting of Chronic Gaming Malfunctions and Losses Goes Unanswered*

o.     When it became clear that Defendants would not address, resolve or remedy the extensive and repeated online gaming malfunctions, Plaintiff sent formal complaints to Borgata online management on or about August 26, 2019, e-mailing

priority_support@borgatacasino.com and formalcomplaint.nj@borgatacasino.com, in accordance with Defendants' published dispute resolution guidance and as directed by HOGAN.[7] As he had done earlier, Plaintiff outlined dozens of Game IDs where he experienced substantial losses as a result of the many disconnection and software issues set forth *supra*. No reply or resolution was ever received, and the problems, disconnections and malfunctions by Plaintiffs continued unabated.

---

[7] Per Section 28 of the Borgata's online legal matters/general terms and conditions section.
https://help.borgataonline.com/en/general-information/legal-matters/general-terms-and-conditions.

### *Reporting to Corporate Executives Marcus Glover and James Murren*

p.      On or about September 23, 2019, continuing in his unsuccessful efforts to seek redress, Plaintiff contacted via e-mail GLOVER and MURREN – top leadership at the Borgata working for Defendants – again reporting the numerous and continuous online gaming issues he continued to experience. In the e-mail, Plaintiff outlined in great detail the ongoing malfunctions he encountered while playing live dealer blackjack that had cost Plaintiff a substantial amount of money, and indicated he was sending the e-mail as "a last resort."

q.      On or about September 26, 2019, GLOVER telephonically contacted Plaintiff in response to his e-mail. GLOVER apologized profusely but indicated he would contact SABATER to address the problem, who would in turn contact Plaintiff when he had an update.

r.      On or about October 1, 2019, Plaintiff undertook yet another unsuccessful campaign to resolve his complaints and losses through SABATER, as directed by GLOVER. Plaintiff provided SABATER with dozens of Game IDs but the stonewalling continued, with SABATER claiming via text communications that they were "*awaiting word from our Tech team,*" and falsely promising he would "*make it an utmost priority to get an answer tomorrow.*" Plaintiff replied, "*[p]lease I really want to finish this up,*" but never heard from SABATER again.

s.      On or about October 3, 2019, after receiving no resolution from SABATER, Plaintiff sent another e-mail to GLOVER via GLOVER's assistant, Catherine Johnson-Wilhelm ("JOHNSON"). In the email, Plaintiff advised that he felt like as a VIP customer he was "getting the runaround," indicated these issues had been ongoing for several months, and that he was formally seeking resolution because he did not want to waste any further time on this anymore.

t.      On or about October 4, 2019, JOHNSON responded to Plaintiff via e-mail,

confirming it was forwarded to GLOVER. JOHNSON further wrote, *"At this time, [GLOVER]*

*does not have any updates on your case, but he wanted me to assure you that as soon as he had*

*any information, he will be sure to reach out to you."*

u.      Receiving no further contact from GLOVER, Plaintiff e-mailed JOHNSON for an

update on resolution of his complaints. On or about October 15, 2019, JOHNSON confirmed

she had forwarded Plaintiff's earlier e-mails to GLOVER and stated, *"we were under the*

*impression that your issue had been resolved by GVC. I have reached out to GVC again and*

*they should be reaching out to you shortly."* As more fully set forth in Paragraph 14 *supra*, GVC

holdings (now ENTAIN) was involved in a 50/50 joint venture with MGM RESORTS to create

online betting and sports betting platform in the United States, including through BetMGM and

the Borgata. Plaintiff received no further contact or resolution from GLOVER, JOHNSON or

GVC Holdings.

v.      On various occasions in or about October 2019, Plaintiff continued to text

HOGAN with updates on his efforts to seek resolution through corporate leadership. HOGAN

told Plaintiff to *"let it go, let it pass,"* in an effort compel Plaintiff to stop complaining as

HOGAN continued to steer Plaintiff greater and greater bonus payments in exchange for his

silence, in amounts exceeding $30,000 per month, as more fully set forth *infra*.

### *VIP Manager Jerry Liang*

w.      Beginning in or about December 2019, VIP Manager LIANG assumed Plaintiff's

account from HOGAN. Though LIANG was already familiar with the chronic online gaming

malfunctions and losses sustained by Plaintiff. Plaintiff continued to complain about the

recurring issues in a continuous effort to seek redress by submitting numerous cell phone

screenshots to LIANG evidencing the gaming malfunctions. Complaints submitted to LIANG

via text message were never met with any resolution, but rather daily bonus payments between

$1,000 and $5,000 to incentivize Plaintiff to continue gambling and stop seeking resolution of

the online gambling malfunctions.

        x.      Text communications with LIANG further established that, as with HOGAN,

LIANG repeatedly acknowledged the ongoing problems with Defendants' live online gaming

platforms but did nothing to resolve it. Instead, LIANG attempted to dissuade Plaintiff from

sharing screenshots to report continued online gaming malfunctions.

        y.      For example, on or about December 16, 2019, Plaintiff sent a text message to

LIANG expressing his frustration from his repeated disconnections from Defendants' online

gaming servers. LIANG replied, *"Yeah I hear you. I can do one more for you today, but I don't*

*have to cap it."* LIANG's reference to "one more" referred to the Defendants' practice of

making bonus payments to Plaintiff following online gaming malfunctions to ensure his

continued concealment of these problems as well as his continued gambling activity.

        z.      The next day, on or about December 17, 2019, Plaintiff set a text message

advising LIANG that he e-mailed several screenshots to LIANG demonstrating his continued

disconnections. LIANG replied, *"Good morning boss I already loaded you up with a $3K, will*

*do another $1K later."* LIANG's reference to "$3K" and "$1K" referred to Defendants' practice

of making bonus payments to Plaintiff following online gaming malfunctions to ensure his

continued concealment of these problems as well as his continued gambling activity.

        aa.     The next day. on or about December 18, 2019, Plaintiff reported a disconnection

after 5 minutes of play, to which LIANG replied, *"did you get the bonuses?"* Plaintiff

acknowledged receiving the bonuses, but lamented about losing on advantageous hands with

double-downs. LIANG replied, *"Woow that's insane . . . I really don't even know what to say that is mind boggling."*

bb. The following day, on or about December 19, 2019, Plaintiff again reported disconnections and losses on other of the Defendants' online gaming platforms, to which LIANG replied, *"Wow, this is absolutely insane. Can't even catch a brake [sic] on one site.*

cc. On or about December 30, 2019, after Defendants' continued inaction concerning the chronic gaming issues, Plaintiff sent LIANG several more screenshots evidencing continuing disconnection and account issues. LIANG lamented over access issues LIANG was experiencing as well, indicating that for several days he was unable to gain online access to service his assigned VIP customers. Plaintiff's repeated attempts to resolve the malfunctioning through Defendants went unresolved for an extended period into January 2020. All throughout, LIANG and others continued to seed bonus payments to Plaintiff.

dd. Throughout January 2020, Plaintiff continued to report recurring gaming issues to LIANG, including, but not limited to, Defendants' failure to expeditiously process withdrawal requests from Plaintiff's player account. As a result of delays up to several hours, Plaintiff continued to make deposits with additional personal funds in amounts up to $25,000, while continuously gambling at a compulsive rate. On or about January 9, 2020, when advised of the ongoing cash-out issues, LIANG replied via text communication, *"I am trying to get it done but everyone [at the Borgata] seems to have their own agenda."*

ee. Several hours later in that same text communication, Plaintiff advised that he was finally able to withdraw funds from his account. LIANG apologized and stated it was not acceptable that it took so long. Plaintiff stated that he has come to expect nothing but the worst from the Borgata online, to which LIANG replied, *"[a]t least you understand what I'm dealing*

*with on a daily basis."* Furthermore, LIANG blamed the casino's ineffectiveness on inexperienced staff, stating *"[n]ot sure what [HOGAN] told you about this place before he left but everyone that was working for the company previously wasn't."*

   ff. In another text communication on or about January 11, 2020, Plaintiff advised LIANG that he reviewed the many screenshots of online gaming disconnections, stating *"it is amazing [how] everything is 14 to 16 minutes to disconnections."* LIANG avoided addressing the Plaintiff's latest complaint but again steered additional hush bonus payments to Plaintiff stating, *"I can throw something in when I'm back home I'm still driving."* LIANG later followed up with Plaintiff by stating, *"[j]ust got back you'll be loaded up in the next 5 mins."* Later that day, Defendants "loaded up" Plaintiff's account with additional bonus money as promised.

### *The Corrupt Scheme to Buy Plaintiff's Silence and Avoid Regulatory Scrutiny*

38. At all times relevant to this Complaint, Defendants took knowing and intentional actions to conceal Plaintiff's complaints and the reporting of the chronic online gaming malfunctions.

39. Within days of contacting corporate executives GLOVER and MURREN, as more fully set forth *supra*, HOGAN and Defendants attempted to corruptly induce Plaintiff to remain silent in writing in exchange for additional bonus payments. On or about October 8, 2019, during a text communication, HOGAN explicitly set forth the corrupt scheme, stating, *"Ok let's do this I need you [to] email me that we are closing the case and that you will no longer contact Marcus [GLOVER] or the DGE regarding the case."*

40. Seeing no resolution to his complaints and losses forthcoming, Plaintiff had no choice but to agree. Thereafter, Defendants issued near daily bonus payments to Plaintiff in amounts

greater than $30,000 per month. However, chronic online gaming malfunctions and losses continued to adversely affect Plaintiff, with no remediation by Defendants.

41.     LIANG, like HOGAN, also made an explicit *quid pro quo* admission during a text communication on or about January 10, 2020. During this communication, Plaintiff advised LIANG that he had "a zillion" screenshots evidencing disconnected/frozen games whenever LIANG wanted them, but LIANG instead continued to ply Plaintiff with corrupt bonus payments to *"avoid a whole ordeal"* of having Plaintiff continue to report gaming malfunctions and losses.

42.     On or about January 15, 2020, in yet another example of Defendants attempting to prevent Plaintiff from reporting continuous online gaming malfunctions, LIANG told Plaintiff to, *"h]old off on the screenshots for now. As of today, we are starting to compile ALL VIP players with the same disconnection issues."*

43.     In this text communication, LIANG confirmed that Plaintiff was not alone in experiencing chronic problems with Defendants' online gaming platform. Several other individuals engaging in simultaneous online gaming with Plaintiff during the 9-month Period complained of similar malfunctions and issues with Defendants' online gaming platforms via the online chat feature within the platform.

44.     As a further part of the corrupt scheme, there was at least one instance in which LIANG received a non-disclosed kickback from Plaintiff from proceeds that were won by Plaintiff during financially advantageous online gaming sessions where the system did not malfunction.

### *Defendants Were Fully Aware of Plaintiff's Compulsive Gambling Activities*

45.     In addition to the detailed disclosures made by Plaintiff, as more fully set forth in Paragraph 37(b), *supra*, Defendants were fully aware of the scope and nature of Plaintiff's

compulsive gambling problem by the extremely high rate and frequency of his gambling activities.

46.     Plaintiff engaged in prolific gambling binges, as set forth in Paragraph 25, *supra*. Moreover, upon information and belief, Defendants employed predatory gambling practices by using software and player tracking data to target and exploit Plaintiff to continually monetize and take advantage of his robust gambling behavior.

47.     Defendants were aware of Plaintiff's compulsive gambling behavior not only through the above-referenced key employees and extreme gambling patterns, but also through the Borgata legal department which was served with a grand jury subpoena issued by the Superior Court of New Jersey on or about August 15, 2019. Records requested in the subpoena related to Plaintiff's gambling activities, and clearly demonstrated Plaintiff's extreme gambling patterns – hundreds of thousands of dollars won and lost, and nearly a half-million dollars in transfers from Plaintiff to the Borgata during a fixed period that overlapped with the 9-month Period.

48.     On or about September 13, 2019, the Borgata legal department was also served with a civil subpoena issued by the U.S. Securities and Exchange Commission (SEC). In this subpoena, the SEC sought records and information relating to Plaintiff and affiliated business entities during the period of September 2018 to the [then] present, specifically any communications and monetary payments made to/from Defendants and Plaintiff.

49.     Defendants, however, in the weeks that followed the issuance of these subpoenas, attempted to induce Plaintiff to continue to engage in a corrupt scheme to conceal the chronic gaming malfunctions and financial losses from DGE and other regulatory authorities. In return, Defendants bribed Plaintiff by steering in excess of $30,000 in bonus payments per month in

exchange for his continued concealment of the malfunctions and problems from regulatory authorities.

50.    On or about January 16, 2020, Plaintiff was advised that Defendants had permanently banned him from all online casino gaming and all properties owned by Defendants.

51.    As recently as on or about August 27, 2022, Defendants, after banning the Plaintiff from all casino gambling activity, sent an e-mail solicitation to the Plaintiff seeking to authenticate his player's account and ensure the Plaintiff's mobile number was up to date. The solicitation also included an invitation to the Plaintiff to continue online gambling through a "Bet Now" button.

52.    At all times relevant to this Complaint, Defendants nonetheless permitted the continuation of the aforesaid online live dealer blackjack and online slots games, known to routinely malfunction and cause account integrity issues to VIP customers, and continued to promote and offer these malfunctioning online gaming platforms to the general public.

## CAUSES OF ACTION

### *COUNT I*
### *Violation of the New Jersey Consumer Fraud Act (N.J.S.A. 56-8-1 et seq.)*

53.    Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

54.    Defendants are liable under multiple bases of the New Jersey Consumer Fraud Act, including, but not limited to: (a) deception, fraud, false pretenses, false promises or misrepresentations; (b) knowing concealment, suppression or omission of material facts; and (c) violations of statutes and applicable online gaming administrative regulations.

55.    Defendants engaged in a pattern and practice of defrauding and misleading customers, including, but not limited to Plaintiff, of their rightful earnings.

56.     In furtherance of this scheme to defraud, Defendants caused and intentionally allowed online games with known malfunctions and problems with its software and connection to continue to be available to consumers and the general public.

57.     In furtherance of this scheme to defraud, Defendants' online gaming software routinely disconnected Plaintiff and other gamblers in the midst of financially advantageous hands, then forced the user to attempt to re-access the online gaming platform in unsuccessful efforts to return to earlier game status.

58.     In furtherance of the scheme to defraud, the pattern and practice included online customer accounts wherein Defendants wrongfully deducted funds from Plaintiff and other players' account balance that were properly earned and won without Plaintiff and other players' knowledge.

59.     In furtherance of the scheme to defraud, Defendants' online gaming platform malfunctioned wherein on several occasions Plaintiff and others' bankroll failed to properly increase on successfully played hands.  Only after Plaintiff and consumers made additional deposits towards further online gambling would such "stuck" funds be released to the consumer, in many cases, several hours later.

60.     In furtherance of the scheme to defraud, Defendants' pattern and practice continued unabated for at least the 9-month Period, during which Plaintiff sustained hundreds of thousands of dollars in losses as a result of Defendants' false and fraudulent promises to remedy the ongoing malfunctions.

61.     In furtherance of the scheme to defraud, Defendants' pattern and practice involved regular and systematic violations of applicable and governing rules and regulations, to wit:

       a.     Knowingly violating the Casino Control Act ("CCA") which requires that all licensees assure the financial integrity of casino operations by properly maintaining a casino bankroll adequate to pay winning wages to casino patrons when due (Art. 6, § 5:12-84).

b.   Knowingly violating the CCA by failing to perform an annual system integrity and security assessment conducted by an independent professional subject to approval of the Division (N.J. Admin. § 143-69-1.(q)).

c.   Knowingly violating the CCA by failing to have an internet gaming manager responsible for the operation and integrity of internet gaming and reviewing all reports of suspicious behavior. (N.J. Admin. § 143-69-1.(i)).

d.   Knowingly violating the CCA by failing to investigate each patron complaint related to internet gaming; failing to respond to complaints within five calendar days; and failing to provide a copy of the complaint and the licensee's response, including all relevant documentation, to the Division (N.J. Admin. § 143-69-1.(r)).

e.   Knowingly violating the CCA by failing to implement training for internet gaming employees who had direct contact with patrons via phone, email, electronic chat, or other means, to recognize the nature and symptoms of gambling behavior and responding to those who disclose having such problems (N.J. Admin. § 143-690-1.(r)).

f.   Knowingly violating the CCA by failing to perform an authentication process on all gaming control programs on demand and at least once every 24 hours; and failing to provide a mechanism to notify the operator whenever an authentication process has failed.

62.   In furtherance of the scheme to defraud, Defendants falsely advertised themselves as organizations possessing "a unified commitment to responsible gaming" and organizations that provided safe and reliable gaming systems.

63.   In furtherance of the scheme to defraud, Defendants lured Plaintiff into believing the chronic and continuous online software gaming issues would be resolved favorably, and that Defendants were actively seeking corrective action.

64.   In furtherance of the scheme to defraud, Defendants wrongfully engaged in a continuous pattern and practice of bribing Plaintiff to conceal ongoing online gaming malfunctions and issues from the DGE by controlling and exploiting a known high-risk gambler with bonus payments in exchange for his continued silence and robust gambling activities.

65.    In furtherance of the scheme to defraud, and as a result of Defendants' pattern and practice, Plaintiff continuously gambled on malfunctioning and defective online gaming systems to his financial, emotional and penal detriment.

66.    In furtherance of the scheme to defraud, Defendants' pattern and practice was to at all costs keep the malfunctioning games operational and available to the general public while ensuring Plaintiff: (a) maintained the secrecy of his complaints and concealed the ongoing problems; and (b) continued to feverishly gamble to keep the known "moneymaker" games profitable for Defendants without interference from regulatory authorities.

67.    As a result, Plaintiff has suffered, and continues to suffer, damages.

## COUNT II
### Civil Conspiracy

68.    Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

69.    Defendants collectively conspired and agreed to secure and monetize an already profitable business by knowingly allowing malfunctioning games to wrongfully abort games when customers were in financially advantageous gambling positions.

70.    Defendants also conspired and agreed to convert for their own collective uses funds rightfully won and owned by Plaintiff and other online patrons.

71.    Defendants conspired and agreed to effectuate the said conspiracy by routinely ignoring repeated complaints from Plaintiff and others concerning chronic gaming and software malfunctions, disconnections and freezes by falsely promising to resolve the reported issues.

72.    Defendants conspired and agreed to further effectuate the said conspiracy by paying Plaintiff and other patrons "hush" money in the form of bonus payments so they would continue

26

to generate Defendants' gambling revenue while the ongoing system issues remained concealed from regulatory authorities.

73.     On various occasions during the 9-month Period, Defendants effectuated the civil conspiracy by converting funds from Plaintiff's account or future winnings while stonewalling his complaints and failing to meaningfully address them. Instead, Defendants preyed on Plaintiff's known gambling addictions by plying him with bonus money payments to ensure his continuous pace of gambling activity.

74.     Defendants conspired and agreed to commit fraud and conversion against Plaintiff and others by causing significant monetary losses to Plaintiff while knowingly exploiting his gambling addiction.

75.     As a result, Plaintiff has suffered, and continues to suffer, damages.

### *COUNT III*
*Racketeer Influenced and Corrupt Organization Act Violations (N.J.S.A. 2C:4-1 et seq.)*

76.     Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

77.     During at least the 9-month Period, Defendants participated in a pattern of racketeering activity during a substantial period of time.

78.     The pattern of racketeering activity consisted of at least two (2) acts of racketeering committed within ten (10) years of each other, with at least one act occurring after the effective date of the statute.

79.     Defendants operated an enterprise that engaged in a pattern of racketeering activity, including, but not limited to, bribery, extortion and fraudulent practices routinely employed against Plaintiff during at least the 9-month Period.

80.      From the corporate executive level on down through several VIP managers, Defendants were fully aware of the continuous problems with their online gaming platforms, as made clear by the multitude of communications made and retained by Plaintiff. Defendants, however, did not remediate these problems.

81.      Rather, Defendants took affirmative steps to engage in a continuous pattern of actions to hinder and impede Plaintiff from reporting the ongoing malfunctions to the DGE and other regulatory authorities.

82.      Defendants and their employees made repeated false and fraudulent misrepresentations to Plaintiff by claiming his complaints and losses were being addressed and would soon be remedied, knowing that Plaintiff would rely to his detriment on those falsities.

83.      Defendants further fraudulently induced Plaintiff to keep quiet and continue his feverish gambling activities by sustaining his gambling with bribe payments in the form of bonus payments exceeding $30,000 per month. Plaintiff relied to his financial and psychological detriment on these false representations.

84.      Defendants fraudulently deprived Plaintiff of his rightfully earned funds and engaged in a deliberate pattern to wrest such funds from him, falsely assuring him the malfunctions would be resolved and his substantial losses would be restored.

85.      Defendants, by and through their employees, attempted to induce Plaintiff into entering a corrupt scheme wherein Defendants took numerous steps to, at all costs, ensure Plaintiff kept quiet; ensure he would "close" the case; stop him from further contacting GLOVER; and conceal the matter from the DGE and other regulatory authorities. Upon information and belief, concealment of these malfunctions and software issues was critical to avoid any problems with

casino licensure under the CCA, the states where online live gaming was conducted, and the dozens of other states where Defendants planned to expand their business operations.

86.     As more fully set forth above, Defendants various predicate corrupt actions and racketeering were facilitated through an enterprise that affected trade or commerce, and its activities affected trade or commerce, by virtue of the online gaming platforms offered for play via internet and other telecommunications facilities.

### *COUNT IV*
### *Breach of Contract*

87.     Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

88.     Defendants breached their contractual obligations owed to Plaintiff by failing to provide reliable and effective online gaming in compliance with their advertised statements and the CCA.

89.     Defendants breached their own contractual obligations set forth in their very own terms and conditions publicized on their website which states that the parties are bound by a contract upon the player clicking on "Submit" or "I Agree," and/or by using Defendants' services. By doing so, the parties entered into a "legally binding agreement" per the website.[8]

90.     Defendants' Disconnection and Cancellation Policy ("the Policy") on the online casino website provides that, among other matters, when a player becomes disconnected in a game where no player input is required to complete the game, the game will produce the final outcome as determined by the random number generator.

91.     The Policy further provides that, if a player becomes disconnected while involved in a single-player game where player input is required to complete the game, Defendants would,

---

[8] Help - General Information - Terms and Conditions (borgataonline.com); see also Help - General Information - Terms of Service - Borgata Hotel Casino & Spa - Online Gaming Services (borgataonline.com)

upon subsequent activation, return the player to the game state immediately prior to the interruption and allow the player to complete the game; after an approved period of time, cancel the game resulting in either forfeiture of the player's wager or return the funds to the player in accord with a methodology approved by the Division; or make a selection on behalf of the player in order to complete the game.

92.     Defendants breached their own terms and conditions by: (a) failing to respond to or address Plaintiff's repeated complaints to the published "Customer Service Team" concerning his recurring problems and losses due to online gaming disconnections and failures; (b) failing to return Plaintiff to games upon disconnection; and (c) failing to return Plaintiff to designated "free spin" status after disconnections.

93.     Defendants had a contractual obligation wherein Plaintiff would wager certain monies and Defendants would pay any monies won.  Plaintiff met his obligations under the said contract. In breach of their obligations pursuant to this contract, Defendants failed to pay monies owed to Plaintiff, and took funds from Plaintiff's account belonging to Plaintiff.

94.     As a result, Plaintiff has suffered, and continues to suffer, damages.

***COUNT V***
***Fraud***

95.     Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

96.     Defendants and their employees, all of whom possessed authority to make representations, made material representations and statements to Plaintiff that their online gaming platform was functional and reliable when it was not; that Plaintiff's complaints would be reviewed and resolved; and that the funds and losses taken from Plaintiff would be restored.

30

97.     Defendants made such promises and representations while never intending to remediate the ongoing problems or reimburse Plaintiff, to induce Plaintiff to conceal the online gaming issues from the DGE and other regulatory authorities; and to ensure Defendants would continue to monetize and take advantage of Plaintiff's prolific gambling activity.

98.     Defendants knew that Plaintiff would believe said promises and representations; Plaintiff believed these promises and representations to be true and Plaintiff relied on these representations as true.

99.     Defendants' representations and statements were false and fraudulent, designed to sustain Plaintiff's addictive gambling behavior and ensure his secrecy during at least the 9-month Period.

100.    Defendants also fraudulently advertised and marketed Defendants' live dealer blackjack, slots and other online gaming as operational and reliable, capable of maintaining the integrity of a player's account and bankroll balance, when Defendant knew its online gaming platform was malfunctioning and failing nearly 50% of the time.

101.    As a result, Plaintiff has suffered, and continues to suffer, damages.

### COUNT VI
### Gross Negligence

102.    Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

103.    At all times relevant to this Complaint, Defendants owed Plaintiff and the general public the duty of exercising the most minimal degree of care required of an online casino holding itself out for gambling business to patrons.

104.     The minimal degree of care required that Defendants respond to and investigate consumer complaints in a prompt and concerned manner; and to expeditiously resolve any issues discovered.

105.     The minimal degree of care required that Defendants offer online gambling that functioned properly, and was reliable and operational to ensure the integrity of the gaming offered to the general public by Defendants.

106.     The minimal degree of care required that Defendants refrain from preying on Plaintiff, a known longtime patron with a gambling addiction who maintained readily available internet access to the world of online gambling.

107.     In breach of these degrees of care, Defendants were grossly negligent in that they willfully and wantonly induced Plaintiff to excessively gamble by preying on his addiction, and plied him with near-daily corrupt bonus payments to ensure his continued gambling and to avoid scrutiny of the DGE and other regulatory authorities.

108.     In further breach of these degrees of care, Defendants were grossly negligent in that they willfully and wantonly employed elaborate player monitoring, advertising systems, VIP services, and electronic surveillance equipment that was designed to exploit Plaintiff and ensure his continued gambling frequency.

109.     In further breach of these degrees of care, Defendants were grossly negligent in that they willfully and wantonly engaged in deceptive marketing and advertising, and made false and misleading representations concerning the integrity and reliability of Defendants' online gaming systems.

110.     In further breach of these degrees of care, Defendants were grossly negligent in that they willfully and wantonly failed to properly disclose the risks of online gambling to Plaintiff and the

general public, particularly in an industry and business that relies on compulsive gambling and addiction for Defendants' business model to be prosperous.

111.    In further breach of these degrees of care, Defendants were grossly negligent in that they willfully and wantonly failed to correct known and repeated malfunctions and disconnections occurring with Defendants' online gaming systems after receiving numerous complaints from Plaintiff and others.

112.    In further breach of these degrees of care, Defendants were grossly negligent in that they failed to affirmatively inspect and monitor the integrity of their gaming equipment and online gaming platforms, to ensure the consistent and continuous integrity of such systems that were made available to Plaintiff and the general public.

113.    Defendants' gross negligence recklessly disregarded its duty and degree of care owed to Plaintiff and the general public, and Defendants' acts and failures to act created an unreasonable risk of harm to Plaintiff and others.

114.    Defendants' gross negligence and reckless conduct was reasonably foreseeable, and Plaintiff's injuries were the result of Defendants' failure to exercise the minimal degree of care required.

115.    As a result, Plaintiff has suffered, and continues to suffer, damages.

### COUNT VII
### Negligence

116.    Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

117.    At all times relevant to this Complaint, Defendants owed Plaintiff and the general public a duty to offer online gaming that functioned properly, did not routinely malfunction and disconnect patrons, and could be relied upon by Plaintiff and the general public.

33

118.    Defendants further owed a duty to Plaintiff and the general public to ensure the integrity and accuracy of a patron's online gaming bankroll and account balance, and to ensure that proper amounts were deposited and withdrawn into customer accounts.

119.    Defendants further owed a duty to Plaintiff and the general public to respond to and investigate consumer complaints in a prompt and concerned manner; and to expeditiously resolve any issues discovered.

120.    Defendants further owed a duty to Plaintiff to refrain from preying on Plaintiff, a known longtime patron with gambling problems who maintained readily available internet access to the world of online gambling.

121.    Defendants further owed a duty to Plaintiff and the general public to engage in fair and accurate marketing and advertising, and provide the public with truthful representations concerning the integrity and reliability of Defendants' online gaming systems.

122.    Defendants further owed a duty to Plaintiff and the general public to affirmatively inspect and monitor the integrity of their gaming equipment and online gaming platforms, to ensure the consistent and continuous integrity of such systems that were made available to Plaintiff and the general public.

123.    In breach of these duties, Defendants:

    a.      Fraudulently induced Plaintiff to excessively gamble by preying on his addiction, and plying him with near-daily corrupt bonus payments to ensure his continued gambling and to avoid scrutiny of the DGE and other regulatory authorities;

    b.      Failed to properly monitor and maintain online gaming systems offered to Plaintiff and the general public;

    c.      Failed to property monitor and maintain Plaintiff and other patrons' bankroll

and customer accounts balances;

      d.      Failed to respond to, address or take correction action on numerous complaints by Plaintiff and other patrons concerning recurring malfunctions and disconnections of online gaming offered by Defendants;

      e.      Employed elaborate player monitoring, advertising systems, VIP services, and electronic surveillance equipment that was designed to exploit Plaintiff and ensure his continued gambling frequency;

      f.      Engaged in deceptive marketing and advertising, and making false and misleading representations concerning the integrity and reliability of Defendants' online gaming systems; and

      g.      Failed to properly disclose the risks of online gambling to Plaintiff and the general public, particularly in an industry and business that relies on compulsive and frequent gambling for Defendants' business model to be prosperous.

124.    Defendants above-referenced breaches of duty proximately caused damages to Plaintiff as a result of Defendants' negligence.

125.    As a result, Plaintiff has suffered, and continues to suffer, damages.

***COUNT VIII***
***Conversion***

126.    Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

127.    On numerous occasions during at least the 9-month Period, Defendants maintained possessive and/or ownership interests in monies held in Plaintiff's bankroll and player account and winnings due and owing or collected from Defendants.

128.    During this period, Plaintiff made repeated formal demands for Defendants to return or pay the money and property to him, to which Defendants refused.

129.    During this period, for the reasons more fully set forth herein this Complaint, Defendants

willfully and negligently deprived Plaintiff of his right to possession of said money and property.

**COUNT IX**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

130.    Plaintiff realleges and reincorporates the allegations contained in the foregoing

paragraphs as if fully set forth herein.

131.    The law requires Defendants, as a contracting party, to act in good faith, abstain from

deception, and practice honesty and equity in its dealing with Plaintiff.

132.    The contractual agreement between Defendants and Plaintiff, as more fully set forth

above and in Count IV, has, as part of its terms, an implied covenant of good faith and fair

dealing.

133.    Under this contractual agreement and in accordance with well-settled law, Defendants

were obligated to deal with Plaintiff fairly and in good faith.

134.    Defendants unfairly prevented Plaintiff from receiving the various financial benefits to

which he was entitled under the contract, namely monies deposited into his bankroll account,

monies from financially advantageous hands that were aborted due to chronic online gaming

malfunctions, and proper maintenance of Plaintiff's bankroll account.

135.    Defendants acted in bad faith by engaging in the corrupt and wrongful conduct set forth

herein, without Plaintiff's permission, and in violation of the parties' contractual obligations,

custom, practice, expectations, and course of performance and dealing.

136.    Defendants' bad faith conduct deprived Plaintiff of the benefit of his bargain under

the contractual agreement and represents a breach of the implied covenant of good faith and

fair dealing.

137.    As a result, Plaintiff has suffered, and continues to suffer, damages.

36

### *COUNT X*
### *Unjust Enrichment*

138.   Plaintiff realleges and reincorporates the allegations contained in the foregoing paragraphs is if fully set forth herein.

139.   At all times relevant to this Complaint, Defendants accepted money from Plaintiff in exchange for his right and privilege to play Defendants' online gaming, and to be paid if he won.

140.   Plaintiff paid hundreds of thousands of dollars to Defendants in exchange for the ability to gamble and play Defendants' online games.

141.   Plaintiff won and/or was at the threshold of winning on hundreds of occasions while playing Defendants' online games. Plaintiff also deposited and retained funds balances that were improperly reduced or taken by Defendants.

142.   Plaintiff expected payment from Defendants on each occasion where he played Defendants' online games and was deprived of said money and property. Plaintiff further expected payment and reimbursement from Defendants for funds improperly taken and retained by Defendants.

143.   Defendants did not reimburse or pay Plaintiff funds to which he was entitled and deserving of, and Defendants' retention of such monies belonging to Plaintiff would be unjust.

144.   Defendants have been unjustly enriched by their retention of money and property they failed to pay and reimburse Plaintiff, at the expense of Plaintiff.

145.   As a result, Plaintiff has suffered, and continues to suffer, damages.

**WHEREFORE**, Plaintiff demands judgment for the following relief against Defendants, jointly and severally, for:

      h.   Compensatory Damages;

      i.   Consequential Damages;

j.  Punitive Damages;

k.  Treble Damages;

l.  Attorneys' fees and costs;

m.  Interest; and

n.  Such other further relief as the Court deems just, equitable and proper under the circumstances.

> **KINGSTON COVENTRY LLC**
> *Attorneys for Plaintiff Sam A. Antar*
>
> By: */s/ Christopher J. Gramiccioni*
>         Christopher J. Gramiccioni

Dated: September 28, 2022

> **[NAME OF MARGO'S FIRM]**
> *Attorney for Plaintiff Sam A. Antar*
>
> By: */s/ Margo R. Zemel*
>         Margo R. Zemel

Dated: September 28, 2022

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>R.</u> 4:5-1(c), Christopher J. Gramiccioni, Esq. and Margo R. Zemel, Esq. are hereby designated trial counsel for Plaintiff, Sam A. Antar, in this action.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues and claims made herein.

## RULES 4:5-1 AND 1:38-7(b) CERTIFICATIONS

I hereby certify that, pursuant to <u>R.</u> 4:5-1(b)(2), to the best of my knowledge, information and belief, this matter is not the subject of any other action pending in any court or pending in any arbitration proceeding, nor is any other action or arbitration proceeding contemplated to the best of our knowledge and belief.  I further certify that I am unaware of any nonparties who

should be joined in the action pursuant to R. 4:28 or who is the subject of joinder pursuant to R. 4:29-1(b).

I certify that confidential personal identifiers have been redacted from the documents now submitted to the Court, and will be redacted from all documents submitted to the Court in the future in accordance with Rule 1:38-7(b).

**KINGSTON COVENTRY LLC**
*Attorneys for Plaintiff Sam A. Antar*

By: */s/ Christopher J. Gramiccioni*
Christopher J. Gramiccioni

Dated: September 28, 2022

**MARGO R. ZEMEL, ESQ., P.C.**
*Attorney for Plaintiff Sam A. Antar*

By: */s/ Margo R. Zemel*
Margo R. Zemel

Dated: September 28, 2022

## **VERIFICATION**

Sam A. Antar, of full age, upon his verification, states as follows:

1.      I reside at 201 E. 69th Street, New York, New York 10021, and I have personal

knowledge of the matters set forth herein.

2.      I have read the foregoing Verified Complaint, and I hereby verify that all the factual

allegations contained therein are true and correct to the best of my personal knowledge.

3.      I am aware that if any of the foregoing statements made by me are willfully false, I am

subject to punishment.

SAM A. ANTAR

Date:   September 28, 2022

40

# EXHIBIT A

## Non-exhaustive list of GameIDs:

11165638 (2 hands)
11165900 (2 hands)
11166375 (2 hands)
11184412 (2 hands)
11238330 (2 hands)
11254837 (2 hands)
11255752 (2 hands)
11255968 (2 hands)
11256193 (2 hands)
11257910 (2 hands)
11264031 (2 hands)
11264227 (2 hands)
11270227 (2 hands)
11270819 (2 hands)
11270975 (2 hands)
11271187 (2 hands)
11271358 (2 hands)
11272241 (2 hands)
11360839 (2 hands)
11669566 (2 hands)
11671906 (2 hands)
11672158 (2 hands)
11672647 (2 hands)
9126942 (2 hands)
9127309 (2 hands)
9401829 (2 hands)
9925819 (2 hands)
10599633 (2 hands)
11107965 (2 hands)
11144376 (2 hands)
11144575 (2 hands)
11164416 (2 hands)
11164673 (2 hands)
11165900 (2 hands)
11166375 (2 hands)
11184412 (2 hands)
11256193 (2 hands)
11290722 (2 hands)
11307738 (2 hands)
11308141 (2 hands)

1

## EXHIBIT A (cont'd)

11308280 (2 hands)
11308426 (2 hands)
11308847 (2 hands)
11360839 (2 hands)
11361022 (2 hands)
11362940 (2 hands)
11561897 (2 hands)
11580800 (2 hands)
11735744 (2 hands)
11736131 (2 hands)
11736304 (2 hands)
11738145 (2 hands)
11738343 (2 hands)
11740787 (2 hands)
11741382 (2 hands)
11744584 (2 hands)
11745424 (2 hands)
11755162 (2 hands)
11755603 (2 hands)
11755788 (2 hands)
11789758 (2 hands)
11789998 (2 hands)
11790222 (2 hands)
11790425 (2 hands)
11790649 (2 hands)
8664886
8665753
8665753
8665973
8665973
8666181 (2 hands)
8666403 (2 hands)
8666613
8666838 (2 hands)
8667046 (2 hands)
8667255 (2 hands)
8667479 (2 hands)
8667682 (2 hands)
8667883 (2 hands)
8668085 (2 hands)
8668283 (2 hands)
8668511 (2 hands)
8668702 (2 hands)
8669034

## EXHIBIT A (cont'd)

8669379 (2 hands)
8669593 (2 hands)
8669770
8670106 (2 hands)
8670662 (2 hands)
8671116 (2 hands)
8671293 (2 hands)
8671501
8671501
8671682 (2 hands)
8672118 (2 hands)
8672360 (2 hands)
8672548 (2 hands)
8672742 (2 hands)
8672925 (2 hands)
8673135 (2 hands)
8673326
8673337 (2 hands)
8673857 (2 hands)
8674023
8674032 (2 hands)
8674335 (2 hands)
8674526
8674688 (2 hands)
8675089
8675218
8675242 (2 hands)
8675638 (2 hands)
8675854 (2 hands)
8677397 (2 hands)
8677737 (2 hands)

# Civil Case Information Statement

**Case Details: MIDDLESEX | Civil Part Docket# L-004856-22**

**Case Caption:** ANTAR SAM  VS BORGATA HOTEL
CASINO  & SPA LL

**Case Initiation Date:** 09/28/2022

**Attorney Name:** CHRISTOPHER JOHN GRAMICCIONI

**Firm Name:** KINGSTON COVENTRY LLC

**Address:** 1 GATEHALL DR STE 305
PARSIPPANY NJ 07054

**Phone:** 9733702227

**Name of Party:** PLAINTIFF : Antar, Sam, A

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Sam A Antar?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Other(explain)   Former Patron

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO
          **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
          **If yes, for what language:**


**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** YES


I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

09/28/2022
Dated

/s/ CHRISTOPHER JOHN GRAMICCIONI
Signed